UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

**FILED**



JUN 09 2009

CLERK

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

|                              |     |                              |
| ---------------------------- | --- | ---------------------------- |
| UNITED STATES OF AMERICA,    | *   | CR. 09-40043                 |
|                              | *   |                              |
| Plaintiff,                   | *   |                              |
|                              | *   |                              |
| vs.                          | *   | REPORT and RECOMMENDATION    |
|                              | *   | (Motion to Suppress)         |
|                              | *   |                              |
| GARY SULLIVAN,               | *   |                              |
|                              | *   |                              |
| Defendant.                   | *   |                              |
|                              | *   |                              |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

Pending is Defendant's Motion to Suppress (Doc. 21). A hearing was held on Tuesday, May 19, 2009. Defendant was personally present and represented by his counsel of record, Assistant Federal Public Defender Tim Langley. The Government was represented by Assistant United States Attorney Jeff Clapper. Four witnesses testified at the hearing. Additionally, both parties have submitted briefs and oral argument was heard at the conclusion of the hearing. Based on a careful consideration of all of the evidence, and counsel's written and oral arguments, the Court respectfully makes the following:

## RECOMMENDATION

It is respectfully recommended that Defendant's Motion to Suppress be **GRANTED** in part and **DENIED** in part.

## JURISDICTION

Defendant is charged in an Indictment with Passing Counterfeit United States Currency in violation of 18 U.S.C. § 472. The pending Motion to Suppress was referred to the Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Judge Piersol's Standing Order dated November 29, 2006.

## FACTUAL BACKGROUND

This motion to suppress arises out of events which occurred when the Defendant, Gary Sullivan, was arrested after being stopped by Spink County Deputy Sheriff Jonathan Waldner on

March 13, 2009, for a traffic violation. Sullivan was arrested, his vehicle was searched and he gave incriminating statements to law enforcement personnel. Sullivan now moves to suppress "all counterfeit federal reserve notes recovered from [his] vehicle in Spink County South Dakota on March 13, 2009, and any and all evidentiary fruits of that poisonous tree, including but not limited to all statements made by Defendant on the subject of these counterfeit federal reserve notes while in custody between and including March 13, 2009 and Defendant's initial appearance in federal court on March 20, 2009; and to suppress on the independent bases of the Fifth and Sixth Amendments all statements made to all law enforcement in the Beadle County Jail on March 18, 2009, following Defendant's invocation of his right to counsel."

Four witnesses testified at the evidentiary hearing which was held on Tuesday, May 19, 2009. Their testimony is summarized below:[1]

### Carmen Means

Ms. Means is an attorney in Huron, South Dakota. TR 11. She had never met the Defendant before the evidentiary hearing. *Id.* In mid-March, 2009, however, she received a telephone call from Mr. Sullivan's employer inquiring about retaining her to represent Mr. Sullivan. *Id.* The employer asked some questions and indicated he would get back to her. TR 10-11. She did receive a follow-up call, but she was not retained to represent Mr. Sullivan. TR 12, 14. In the meantime, Ms. Means called the Spink County State's Attorney to ascertain what charges were pending in Spink County and when the next court date would be in the event she was retained. TR 12. She was advised Mr. Sullivan did have state charges (driving while revoked, possession of marijuana, and possession of a forged instrument) pending. TR 14, *See* EX C.[2]

---

[1]A transcript of the hearing is on file with the Clerk as Doc. 43. References to the transcript will be by "TR" followed by the appropriate page number.

[2]The admissibility of EX C was taken under advisement during the evidentiary hearing. Upon further consideration, it is relevant and admissible and is therefore received into evidence. The Spink County Complaint was filed on March 16, 2009. The admissibility of EX D was also taken under advisement. EX D shall be admitted into evidence.

Ms. Means took notes of her conversations with Mr. Sullivan's employer and the Spink County State's Attorney. *See* EX E. She did not call the jail to speak to Mr. Sullivan, nor did she visit him at the jail. She did not advise anyone at the jail or sheriff's office or anyone associated with the DCI, the Secret Service, FBI, or the Beadle County Jail that she represented Mr. Sullivan. TR 15.

### Jonathan Waldner

Mr. Waldner is a Deputy Sheriff for Spink County, South Dakota. TR 17. He conducted a traffic stop on March 13, 2009 north of Redfield on Highway 281 at approximately 8:17 p.m. TR 18, EX 1. Deputy Waldner had just finished another traffic stop, and remained at the side of the road with this lights flashing when Mr. Sullivan's vehicle (a purple Dodge Caravan) drove past on the highway. TR 19. Waldner believed Sullivan's vehicle appeared to be going faster than 45 miles per hour, which was the speed limit then in effect according to South Dakota's "move over law" which requires vehicles to move over and slow down to twenty miles below the posted speed limit when an emergency vehicle is present. TR 20. *See* SDCL § 32-31-6.1.[3] Deputy Waldner's radar clocked Sullivan's vehicle at 53 miles per hour. TR 20. Waldner's in-vehicle camera captured the traffic

---

[3]SDCL 32-31-6.1 states: **Stop required upon approaching stopped emergency vehicle using red signals–Requirements for approaching vehicles using amber or yellow signals–Violation as misdemeanor**

Upon approaching from any direction any stopped authorized emergency vehicle making use of red visual signals meeting the requirements of this title, the driver of every other vehicle shall come to a complete stop before reaching the stopped emergency vehicle and may, unless otherwise directed, proceed with caution only after ascertaining that it is safe to do so, and upon approaching from any direction any stopped vehicle making use of amber or yellow warning lights, the driver of every vehicle shall:

    (1) If driving on an interstate highway or other highway with two or more lanes traveling in the same direction as the vehicle, merge into the lane farthest from the vehicle and proceed with caution, unless otherwise directed; or

    (2) If driving on a two lane highway, slow to a speed that is at least twenty miles per hour less than the posted speed limit or five miles per hour when the speed limit is twenty miles per hour or less and proceed with caution, unless otherwise directed.

stop. A recording of the stop was received into evidence as EX 1. [4]

Deputy Waldner approached Sullivan's vehicle and explained the reason for the stop. TR 23. He requested Mr. Sullivan's driver's license, but Sullivan explained his license was suspended for unpaid traffic tickets and back child support. TR 24. *See* EX 1 at 8:19; 8:23. Mr. Sullivan produced a Nebraska identification card. *Id.* Waldner escorted Mr. Sullivan back to his patrol car, (EX 1 at 8:21) and ran the Nebraska license that Sullivan presented through dispatch. TR 24. Waldner advised that Mr. Sullivan would receive a warning ticket for failing to move over pursuant to the move over law. TR 24. When dispatch called to advise that Mr. Sullivan's license was revoked rather than suspended, Waldner informed Mr. Sullivan that he would be arrested pursuant to South Dakota law and standard procedure. TR 25, EX 1 at 8:29. Also pursuant to standard procedure, Mr. Sullivan's vehicle was impounded because there was nobody there on Mr. Sullivan's behalf to remove it from the side of the highway. TR 25-27. Deputy Waldner called for a tow truck (" a 10-31") at 8:29 p.m. *Id.*

After Deputy Waldner told Sullivan he would be arrested, Sullivan indicated he needed to use his cell phone. TR 27. Sullivan began to look through his vehicle for the phone. *Id.* Waldner perceived an officer safety issue, so he placed Sullivan in handcuffs (EX 1 at 8:33) and told him he would retrieve the cell phone out of the vehicle for him. TR 28. Waldner placed Sullivan in the back seat of the squad car. Waldner asked Sullivan whether there were any drugs in the vehicle. *Id.* Sullivan said there was a baggie of marijuana ("weed") in the front pocket of the suitcase which was in the front seat.[5] The patrol car camera recorded Sullivan while he sat in the patrol car.[6] Waldner

---

[4]Deputy Waldner explained that the date and time stamp on the DVD of the traffic stop is not accurate. The date on the DVD is April 13, 2009. The actual date of the stop was March 13. The time is off by about two minutes, but the elapsed time depicted on the DVD is accurate. TR 22-23.

[5]Mr. Sullivan referred to the marijuana as "weed." Mr. Sullivan had not been advised of his *Miranda* rights when he made this statement. TR 28

[6]Mr. Sullivan is heard talking to himself while he sits in the patrol car by himself. He says , "I did not steal it, I want you to know that right now. At the gas station in Sioux Falls.

-4-

then proceeded to conduct an inventory search of Sullivan's vehicle pursuant to Spink County's written policy. TR 28-29. *See* EX 2. The purposes of conducting inventory searches on vehicles which are being impounded is to protect the owners property while their vehicle is in the Sheriff's office custody, as well as to protect the Sheriff's deputies from claims of lost or stolen property. *See* EX 2. Deputy Waldner conducted the inventory search while the vehicle was on the side of the road before the vehicle was towed.[7] He completed an inventory form. TR 30. *See* EX 8.[8] Deputy Waldner looked in the suitcase because that is where Sullivan said the marijuana was. TR 32. He also stated, however, that he would have searched inside the suitcase during a normal inventory search pursuant to the Spink County Policy even if he had not known there were drugs in the suitcase. TR42- 43. Deputy Waldner explained that although it is not contained in the written policy, it is his practice to inventory the contents of closed containers within a vehicle when he conducts an inventory search. *Id.*

---

Someone dropped their sh\*\*. Dropped the envelope. I pulled up to the pump." After Deputy Waldner briefly came back to the patrol car to radio for assistance with the search, Mr. Sullivan continued with his self-talk: "Dude I found that sh\*\*. Sioux Falls. Fu\*\*ing gas station. I stopped in Sioux Falls at the gas station. Hell no I didn't say nothin. Dude, would you say anything? Hey, I didn't steal it. You know I didn't steal it. Picked it up and kept it. Dude, wouldn't you? You seen an envelope full of fu\*\*in money? Wouldn't you fu\*\*in keep it? But no, I did not steal it. I didn't steal it . I did not steal it. I don't keep drug money. I don't know how much it is, I know it's in there, so if they try any funniness." After this, Deputy Waldner interrupts Sullivan's self-talk and enters the patrol car with the envelope of money. He tells Mr. Sullivan he found the money and that he will bring it to the Sheriff's office so that Sullivan can use it to bond out of jail the next day. Sullivan then initiated a conversation with Waldner and asked how much money was in the envelope, claiming he did not know because it was not his. He told Waldner he found it at a gas station on the ground in Sioux Falls. Waldner counted the money in front of Sullivan and told him that unless a store had been robbed in Sioux Falls, the money would be his. Sullivan asked if he needed to fill out a claim sheet for the money, and Waldner told him they would figure it out when they got to the office. EX 1 at 8:49. Sullivan's self-talk continued after Waldner left the patrol car. EX 1 at 8:52.

[7]The policy does not require that the inventory search be conducted by the side of the road before the vehicle is towed. TR 43-44.

[8]Neither the suitcase nor any of the contraband items it contained (marijuana or counterfeit money) are contained on the inventory. This was not explained during the evidentiary hearing.

-5-

The suitcase was in the front passenger seat. TR 33, EX 4. Waldner located the baggie in the front pocket of the suitcase. TR 32. Deputy Waldner field tested the substance found in the baggie and it was marijuana. TR 35. Waldner also located a white, home-made envelope in the front pocket of the suitcase, along with miscellaneous other items. TR 33. *See* EX 4 and 5. The white home-made envelope was a piece of paper folded up so that it was open on both ends. *See* EX 12. The top folded over, but Deputy Waldner cannot remember for sure whether the top was taped shut or not when he found it. TR 36. He looked into the envelope and saw thirteen one-hundred dollar bills. TR 36. Deputy Waldner took the money back to the patrol car and counted it in front of Mr. Sullivan. TR 39. Waldner did not ask for consent to open the envelope. TR 51. He told Mr. Sullivan he could use the cash for bond the next day. TR 40. At that time Deputy Waldner did not know or have reason to believe the money was counterfeit. *Id.* Deputy Waldner returned the contents of the front pocket of the suitcase to their approximate original positions and photographed them. TR 35-36/ *See* EX 5.

Deputy Waldner issued citations to Mr. Sullivan for ingesting a substance other than alcohol, possession of marijuana, and driving with a revoked license.[9] TR 40. He also issued a courtesy warning for the "move over" law. TR 41. Driving with a revoked license is a class 1 misdemeanor. Mr. Sullivan was advised of his *Miranda* warnings after another officer arrived at the scene to assist at 9:02 p.m. EX 1 at 8:59.[10] TR 41-42.

---

[9]Mr. Sullivan was ultimately charged with Possession of a Forged Instrument, Forgery, Possession of Marijuana, and Driving while Revoked in state court. *See* EX C. It is unknown whether these state charges were pursued or were dropped when Mr. Sullivan was indicted on he pending federal charges.

[10]A few minutes before Waldner administered the *Miranda* warnings, another officer entered the vehicle and examined the envelope full of money. He held the bills up to the light and looked at them. After the officer left the vehicle, Mr. Sullivan continued to talk to himself. This time, he said "you ain't gonna find one of my fingerprints on that shi\*. You find my print on the envelope. I just looked in it and seen it was money. Folded that shi\*, stuffed that shi\*, and rolled. Dude, I didn't even finish getting my gas. I didn't even finish getting my gas. I seen that on the ground. When I stuck my thing in, I stuck it in when I was filling up, I looked down, and I'm like, oh shi\*, open it, I'm like oh shi\*, dude, I didn't even finish getting my gas. I ordered $20 worth of gas, and I put maybe $5-$7 into the motherfu\*\*er. Hell no I got up out of there. Whoever lost it is coming back for it, and they ain't goin to find it. You can dust that

Deputy Waldner questioned Mr. Sullivan after Sullivan was transported to the Spink County Jail. TR 53. During that conversation Deputy Waldner questioned Mr. Sullivan about the marijuana and about where Mr. Sullivan got the money which was in the white envelope. *Id.* Mr. Sullivan claimed he found the envelope at a gas station in Sioux Falls. TR 56.

### Randy Walker

Mr. Walker is a Special Agent with the United States Secret Service. TR 63. He became involved in this case when he received a call from the Chicago field office indicating that Mr. Sullivan had been arrested in Spink County and was then in custody in Beadle County. TR 63-64. Walker arrived at the Beadle County Jail on Saturday, March 14, 2009. He advised Mr. Sullivan of the *Miranda* warnings and proceeded to interview Mr. Sullivan. TR 64. Mr. Sullivan first indicated he found the money at a gas station in Sioux Falls. Later Mr. Sullivan changed his story and said he sold three pounds of marijuana and received the counterfeit money in exchange for the marijuana. TR 64. At the end of the conversation, Mr. Sullivan indicated he had passed three of the $100 bills. He passed one at Menards in Mitchell and one at Wal-Mart in Mitchell, but he could not recall where he passed the third one. TR 65. Sullivan did not ask to speak with an attorney at any time during the conversation on Saturday March 14th. *Id.* Walker had not seen the counterfeit money before the conversation with Sullivan on Saturday March 14th. Walker was able to associate the counterfeit money with a certain "family" of counterfeit currency, however, based on his conversation with the employee of one of the establishments where the currency was passed. TR 66.

Agent Walker ran the serial numbers from the counterfeit bills on March 16th. TR 66. He determined that the bills were associated with a counterfeiting operation he had encountered in the past. *Id.* The bills were manufactured by glueing two pieces of paper together. TR 67. When he

shi*, you ain't goin to find that." After this episode of self-talk, Waldner administered the *Miranda* warnings. Waldner then took Sullivan outside for a smoke. When Waldner administered the *Miranda* warnings, he had not yet questioned Sullivan about the legitimacy of the money. After he administered the warning, he took Sullivan out of the vehicle for a smoke. It was during the smoke break that Waldner first asked Sullivan if the money was counterfeit. EX 1 at 9:02.

-7-

examined the bills found in Mr. Sullivan's suitcase, they were manufactured in that manner. *Id.* The bills which were recovered from Menards and Wal-Mart were also manufactured consistent with that pattern. TR 68. On March 17, Agent Walker received a call from the Spink County Sheriff's office indicating Mr. Sullivan wished to speak with him. TR 68. Mr. Sullivan spoke to Agent Walker on the phone and asked when Walker would be coming back to the jail. TR 69. Agent Walker returned to the Beadle County Jail on March 18 with DCI Agent Josh Bobzien. TR 69-70. In the interim, Agent Walker had received not received any communication from an attorney claiming to represent Mr. Sullivan. TR 70.

Walker and Bobzien met with Sullivan in an intake area on March 18. TR 70. Sullivan arrived and indicated he wanted to speak with the Agents, but wanted his attorney present. TR 71. Bobzien asked who Sullivan's attorney was, and Sullivan indicated it was Carmen Means. *Id.* Bobzien offered to call Carmen to get her to the meeting, but Sullivan said Ms. Means was on her way. *Id.* When the Agents asked how Ms. Means knew when the meeting was going to occur, Sullivan indicated he did not really have an attorney and no retainer had been paid yet, but his employer was working on getting him one.[11] TR 72. From this conversation, Agent Walker concluded Sullivan did not have an attorney. *Id.*. Agent Walker then asked "do you want an attorney or do you want to talk to us?" *Id.* Walker told Sullivan he had charged him federally, and showed him a copy of the federal Complaint. *Id.* Walker denies that he told Mr. Sullivan Carmen Means would not be able to help him because the case would be charged in federal court. TR 74. Walker informed Sullivan that his investigation had identified him with a crime in Fargo, North Dakota and that Sullivan's fingerprints had connected him in other places across the United States. TR 72. Walker reiterated to Sullivan that "it was up to him" but cooperation would be brought to the attention of the United States Attorney. When Walker persisted about whether Sullivan wished

---

[11]Walker testified he was previously made aware by Agent Bobzien that Sullivan had been in touch with his employer ("Tweety") to come get the van and bail Mr. Sullivan out of jail.

to proceed, Sullivan said, "let's chop it up." [12] TR 73. Walker administered the *Miranda* warnings and interviewed Mr. Sullivan. Mr. Sullivan did not bring up the subject of an attorney again. *Id.*

### Josh Bobzien

Mr. Bobzien is a Special Agent with the South Dakota Division of Criminal Investigation. He is based out of Huron, South Dakota. TR 77-78. He was contacted on March 13, 2009 by the Spink County Sheriff's Department. TR 78. He spoke with Mr. Sullivan on March 14, 2009, at the Beadle County Jail. TR 78. He also spoke with Mr. Sullivan on March 18, 2009. TR 79. Agent Bobzien monitored Mr. Sullivan's phone calls from the jail. Bobzien was not aware, nor had he been informed by anyone that Mr. Sullivan had retained an attorney. *Id.*

On March 18, Mr. Sullivan was brought to an intake room in the Beadle County Jail. Sullivan, Bobzien and Walker proceeded toward the conference room. TR 80-81. During the encounter in the intake room, Sullivan indicated he wanted to talk with them, but he wanted his attorney present. TR 81. Bobzien asked who Sullivan's attorney was. TR 81. Sullivan said his attorney was Carmen Means. *Id.* Carmen's office is in the same building as Bobzien's. TR 82. Bobzien asked if he could call Carmen to come over to the interview. *Id.* Sullivan said she was on her way. Bobzien asked how Ms. Means could be Sullivan's attorney since Sullivan had not yet had his initial appearance. TR 82. Sullivan explained his employer was helping him hire Ms. Means. *Id.* Bobzien asked how much Ms. Means charged for a retainer fee; Sullivan did not know. *Id.* Bobzien asked if Sullivan had talked to Ms. Means; Sullivan admitted he had not. *Id.* Bobzien asked if Sullivan had actually talked to his boss about hiring Ms. Means; Sullivan admitted he had not. *Id.* Bobzien confirmed with the jail staff that they had not been notified Carmen Means had been retained to represent Sullivan. *Id.* Bobzien asked Sullivan whether he knew whether Carmen was representing him or not; Sullivan said he didn't know. TR 82-83. After this exchange, Walker asked Sullivan whether he wanted an attorney or whether he wanted to talk with the Agents.

---

[12]"Let's chop it up" is street slang for talking or having a conversation. *See* www.urbandictionary.com

TR 83. Sullivan said, "let's chop things up." *Id.* The three men continued to the conference room where Walker administered the *Miranda* warnings and proceeded with the interview. TR 83. Mr. Sullivan did not request an attorney again. TR 84. Bobzien did not tell Sullivan Ms. Means would not represent him because of the federal charges. *Id.*

## DISCUSSION

### Burden of Proof

As a general rule, the burden of proof is on the defendant who seeks to suppress evidence, *United States v. Phillips*, 540 F.2d 319 (8th Cir.1976), but on the government to justify a warrantless search or seizure. *United States v. Bruton*, 647 F.2d 818 (8th Cir.1981). When the defendant claims he invoked his right to have counsel present during a custodial interrogation but was nonetheless interrogated without counsel present, the court must first determine whether the defendant sufficiently and unambiguously invoked the right to counsel. If the defendant sufficiently invoked his right to counsel, the court may admit his response to further questioning only if the defendant (1) initiated further discussions with the police and; (2) knowingly and intelligently waived the right he had invoked. *United States v. Webb*, 755 F.2d 382, 387 (5th Cir. 1988). "The Government bears a 'heavy' burden of proving that a defendant has knowingly and intelligently waived his right to have counsel present during interrogation." *McCree v. Housewright*, 689 F.2d 797, 802 (8th Cir. 1982). The standard of proof is a preponderance of the evidence. *Lego v. Twomey*, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972).

In this case, Sullivan does not dispute the validity of the traffic stop. He claims, however, that his admission regarding possession of marijuana was should be suppressed because it was made while he was in custody and without the benefit of *Miranda* warnings. Sullivan does not dispute the propriety of his arrest for driving with a revoked license. He claims his vehicle was improperly searched incident to his arrest, which led to the discovery of not only the marijuana but also the counterfeit bills in his vehicle, and that those items are therefore fruit of the poisonous tree. He further asserts that all statements he made to law enforcement are likewise fruit of the poisonous

tree, and that his March 18 statement should additionally be suppressed because Agents Walker and Bobzien ignored his request for counsel and persisted with the interview in violation of his Fifth and Sixth Amendment rights.

### 1. The Marijuana Admission

There is no dispute that Sullivan was handcuffed and placed under arrest before Waldner asked whether there were any drugs in the vehicle. There is also no dispute that Waldner asked about the presence of drugs before Sullivan was advised of his *Miranda* rights. "Law enforcement officials must administer *Miranda* warnings whenever they interrogate persons in their custody." *United States v. Brave Heart*, 397 F.3d 1035, 1038 (8th Cir. 2005) (citations omitted). "The prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody . . ." *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966). Sullivan's admission regarding possession of marijuana, therefore, should be suppressed.

That Sullivan's admission is suppressed, however, does not mandate suppression of the physical evidence which was discovered as a result of the admission. "[T]he *Miranda* rule is a prophylactic employed to protect against violations of the Self-Incrimination Clause. The Self-Incrimination Clause, however, is not implicated by the admission into evidence of the physical fruit of a voluntary statement." *United States v. Patane*, 542 U.S. 630, 636, 124 S.Ct. 2620, 2626, 159 L.Ed.2d 667 (2004). Sullivan asserts, however, that he was searched incident to arrest for driving while revoked and that the search incident to that arrest violated his Fourth Amendment Rights pursuant to *Arizona v. Gant*, 129 S.Ct. 1710 (2009).

### 2. Whether the Search of the Van Violated Sullivan's Fourth Amendment Rights

Officer Waldner can be heard on the DVD explaining that because Sullivan's license was

revoked rather than merely suspended, the offense was a Class 1 misdemeanor[13] and Sullivan would be placed under arrest pursuant to South Dakota law. Waldner asked whether anyone could come get the vehicle for Sullivan and Sullivan replied negatively. Waldner then called for a tow truck. After the arrest, the call for the tow truck and the incriminating admission, Waldner searched the van and found the marijuana and the counterfeit money. Sullivan asserts the search was a search incident to arrest that exceeded its proper scope according to *Arizona v. Gant*, 129 S.Ct. 1710 (2009), but the Government asserts *Gant* is not controlling because the van would have inevitably been searched pursuant to Spink County's inventory policy.

### A.    Search Incident to Arrest

In *Gant*, the United States Supreme Court greatly circumscribed the long recognized search incident to arrest exception to the warrant requirement as it was defined by *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969) and applied to vehicle searches by *New York v. Belton*, 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981). As that doctrine evolved and was interpreted by the various courts of appeal, it eventually allowed for the search of an arrestee's vehicle, even after the arrestee had been handcuffed and placed in the patrol cruiser. *See, e.g., United States v. Hrasky,* 453 F.3d 1099, 1102 (8th Cir. 2006). The *Gant* Court, however, narrowed the circumstances in which a vehicle may be searched incident to it's occupant's arrest: "[W]e . . . hold that the *Chimel* rationale authorizes police to search a vehicle incident to a recent occupant's arrest only when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search." *Gant*, 129 S.Ct. at 1719. The Court also carved out another situation in which it will be acceptable for officers to search the arrestee's vehicle: "Although it does not follow from *Chimel*, we also conclude that circumstances unique to the vehicle context justify a search incident to lawful arrest when it is 'reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle'. . . .in many cases, as when a recent occupant is arrested for a traffic violation, there will be no reasonable basis to believe the vehicle contains relevant evidence."

---

[13] SDCL § 32-12-65(1) provides that driving with a revoked license is a Class 1 misdemeanor. The maximum penalty for a Class 1 misdemeanor is one year in the county jail, two thousand dollar fine, or both. SDCL § 22–6-2(1).

*Id.* (internal citations omitted). In *Gant* the subject was arrested for driving with a suspended license and the Court found the search unreasonable under the Fourth Amendment. In *Gant*, however, there was no mention of whether the subject would be transported to the police department or whether his vehicle would be towed from the scene. The *Gant* Court concluded:

> Police may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest. When these justifications are absent, a search of an arrestee's vehicle will be unreasonable unless police obtain a warrant or show that another exception to the warrant requirement applies. The Arizona Supreme Court correctly held that this case involved an unreasonable search.

If the search of the van is characterized as incident to Sullivan's arrest, therefore, it was unreasonable according to *Gant* because Sullivan was handcuffed and sitting in the patrol car when the search occurred. Because he was under arrest for driving with a revoked license, it was not reasonable to believe the van contained evidence of the offense of arrest. Pursuant to *Gant*, however, the Government is entitled to show that another exception to the warrant requirement applies. The Government asserts that another exception does apply, namely the inventory search exception as defined by *South Dakota v. Opperman*, 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976). [14]

## B. The Inventory Search

The Government asserts that even if Sullivan's remark about the presence of marijuana prompted Waldner to begin the search of the van, the result would have been the same because the

---

[14]*Gant* does not require the demise of the inventory search doctrine. *Gant* makes no mention of the inventory search or any of the case law relevant to inventory searches. In *Opperman*, the Court was careful to distinguish cases which "stand[] only for the proposition that the search challenged there could not be justified as one incident to arrest." *Opperman*, 428 U.S. at 375, 96 S.Ct. at 3100. Courts deciding vehicle search issues which have been decided since *Gant* have likewise distinguished themselves from *Gant* when an inventory search has been conducted or was inevitable. *See, e.g. United States v. Nanquilada*, 2009 WL 90124 (W.D. Wash. Jan. 13, 2009) (at *3 fn. 1, noting the case is distinguishable from *Gant* because the vehicles were on the side of the road when the defendant was arrested and would have presumably been impounded and inventoried); *United States v. Sands*, 2009 WL 1303152 (10th Cir., May 11, 2009) (at *3 "had the search of Mr. Sands's vehicle been a search incident to arrest as opposed to an inventory search, we might have a different case." (citing *Gant*)).

-13-

tow truck had already been called and the van would have been inventoried in any event pursuant to Spink County's inventory policy. (Recall the "10-31" call for a tow truck was placed at 8:29, and the question about marijuana was asked at 8:33). This same argument was made by the government and accepted by the Court in *United States v. Gonzalez*, 111 F.3d 136 (8th Cir. 1997)(unpublished opinion, copy attached).[15] In that case, the defendant was stopped for a traffic violation. Although it is not entirely clear, it appears the officer suspected the defendant of drug activity before the stop. The court noted, "[b]ut for the drug investigation, [the defendant's] pickup would have been towed and impounded after he was pulled over because neither [the defendant] nor the other passenger in the pickup truck had a driver's license. Once the car had been impounded, its contents would have been inventoried pursuant to the Plymouth Police Department's inventory procedure. As a result of the inventory, the officers would have discovered Gonzalez's loaded handgun in the camera bag." *Id.* at *2. The court found that because the camera bag would have inevitably been opened in the course of a lawful police inventory, the handgun found in the camera bag was admissible. *Id. See also, United States v. Lewis*, 3 F.3d 252, 254 (8th Cir. 1993) ("The presence of an investigatory motive, however, does not invalidate an otherwise valid inventory search. Having conducted the search of [the defendant's] van according to standardized inventory procedures, the officers' coexistent suspicions that incriminating evidence might be discovered did not invalidate their lawful inventory search."); *United States v. Hall*, 497 F.3d 846, 852-53 (8th Cir. 2007) ("provided the search is conducted according to standard procedures, officers 'may keep their eyes open for potentially incriminating items that they might discover in the course of an inventory search, as long as their sole purpose is not to investigate crime'";*United States v. Alvarez Gonzalez*, 319 F.3d 1070, 1072 (8th Cir. 2003) (inevitable discovery doctrine applied to discovery of firearm in vehicle when defendant's van was searched after he stopped for traffic violation and it was discovered he was an

---

[15]Citation of unpublished opinions is governed by Rule of Appellate Procedure 32.1. Eighth Circuit Local Rule 32.1A provides that unpublished opinions issued before January 1, 2007 generally should not be cited but may be cited if they have persuasive value on a material issue and no published opinion of this circuit or another would serve as well. *Gonzalez* was decided before January 1, 2007 and is cited here because of its persuasive value, because no other Eighth Circuit authority has been found regarding the inevitable discovery doctrine and the inventory search issue regarding a vehicle search following a traffic stop/drug encounter.

illegal alien driving without a valid license). In this case the government asserts that, the officers suspicions about the marijuana aside, the counterfeit bills would have inevitably been discovered during the lawful inventory search of Sullivan's van.

The United States Supreme Court upheld the practice of securing and inventorying an impounded vehicle's contents in *South Dakota v. Opperman*, 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976). The Court found the inventory procedures developed in response to three distinct needs: (1) protection of the owner's property while in police custody; (2) protection of the police against claims or disputes over lost or stolen property; and (3) protection of the police from potential danger. *Id.*, 428 U.S. at 369, 96 S.Ct. at 3097. "The practice has been viewed as essential to respond to incidents of theft or vandalism." *Id.* The Court approved the inventory search in *Opperman*, finding that it was not unreasonable under the Fourth Amendment. *Id.*, 428 U.S. at 377, 96 S.Ct. at 3100.[16] In *Opperman*, the defendant challenged the scope of the search, which included opening the unlocked glove compartment. The Court, however, found the scope was reasonable because "once the policeman was lawfully inside the car to secure the personal property in plain view, it was not unreasonable to open the unlocked glove compartment, to which vandals would have had ready and unobstructed access once inside the car." *Id.*, 428 U.S. 376 n. 10, 96 S.Ct. at 3100 n.10.

"Inventory searches are now a well-defined exception to the warrant requirement of the Fourth Amendment." *Colorado v. Bertine*, 479 U.S. 367, 371, 107 S.Ct. 738, 741, 93 L.Ed.2d 739 (1987). "The policies behind the warrant requirement are not implicated in an inventory search, nor is the related concept of probable cause." *Id.* (internal citations omitted). In *Bertine*, the defendant was arrested for DUI. He was taken into custody, and before the tow truck arrived to take his van to the impound lot, a backup officer inventoried the contents of the van. During the search, the officer opened a closed backpack. Inside the backpack was a nylon bag which contained metal

---

[16]The *Opperman* Court observed that most state courts had approved inventory searches and had "concluded that, even if any inventory is characterized as a 'search' the intrusion is constitutionally permissible." *Id.*, 428 U.S. at 370-71, 96 S.Ct. at 3097-98.

canisters. The officer opened the canisters and found drugs and cash. The officer also opened a zippered pocket in the backpack which contained a sealed envelope. He opened the envelope and found more cash. The defendant challenged the scope of the inventory search–specifically the opening of the closed backpack and the containers within the backpack. The Supreme Court upheld the search. "[R]easonable police regulations relating to inventory procedures administered in good faith satisfy the Fourth Amendment, even though courts might as a matter of hindsight be able to devise equally reasonable rules requiring a different procedure." *Id.*, 479 U.S. at 374, 107 S.Ct. at 742. In *Bertine*, the Court emphasized that the Police Department policy in question mandated the opening of closed containers and the listing of their contents. "Our decisions have always adhered to the requirement that inventories be conducted according to standardized criteria." *Id.* 479 U.S. at 374 n. 6, 107 S.Ct. at 742 n.6.

"An inventory search is not constitutionally reasonable, however, merely because it serves important governmental interests. To pass constitutional muster, the search must be conducted pursuant to standard police procedures. The requirement of standardized procedures serves to remove the inference that the police have used inventory searches as 'a purposeful and general means of discovering evidence of a crime.'" *United States v. Marshall*, 986 F.2d 1171, 1175 (8th Cir. 1993). The requirement for standardized procedures is "based on the principle that an inventory search must not be a ruse for general rummaging in order to discover incriminating evidence." *Id.* (citations omitted).

The Spink County policy was received into evidence in this case as EX 2. The policy is written in general terms, and requires (in part) the Sheriff's Office to "conduct and inventory of the contents of all vehicles impounded or taken into custody. The contents inventoried will be listed on the Spink County Sheriff's Office Vehicle Inventory Form, and kept on file at the Spink County Sheriff's Office." The policy does not specifically require officers to open closed containers to inspect their contents. Deputy Waldner testified, however, that it is his usual practice to open closed containers as a part of an inventory search. That the written policy does not specify whether closed

-16-

containers should be opened during the inventory search is not dispositive. The Eighth Circuit has recognized that standardized procedures include those which are not included in the written policy. *United States v. Kimhong Thi Le*, 474 F3d 511, 515 (8th Cir. 2007). An officer's testimony that he is trained to open closed containers during an inventory search and that it is his standard practice to do so "is sufficient to establish the requisite standardized procedures required to comport with the Fourth Amendment." *Id. See also, United States v. Lowe*, 9 F.3d 43, 44 (8th Cir. 1993) (same). I find that Deputy Waldner's testimony was credible, and that opening an unlocked suitcase and an open-ended envelope within the suitcase during an inventory search pursuant to the Spink County policy as described by EX 2 and by Deputy Waldner's testimony was reasonable under the Fourth Amendment.[17] The physical evidence found within the van, therefore, should not be suppressed.

### 3. Sullivan's Post-Search Statements

Mr. Sullivan also moves to suppress the statements he gave to law enforcement officers after his arrest. The basis of this portion of his motion is twofold: (1) all statements made by him while in custody are "fruit of the poisonous tree" under *Wong Sun v. United States* , 371 U.S. 471 (1973) and *Brown v. Illinois*, 422 U.S. 590 (1975) because the search which led to the discovery of the counterfeit money violated the Fourth Amendment; and (2) the March 18 interrogation should be suppressed for the separate reason that it was conducted after Sullivan requested counsel, but that request was ignored by law enforcement, in violation of Sullivan's Fifth and Sixth Amendment rights.

### A. Fruit of the Poisonous Tree

The first basis for Mr. Sullivan's argument is foreclosed by the Court's finding in Section 2 above. Because the inevitable inventory search did not violate the Fourth Amendment, Sullivan's

---

[17]The procedures described by Waldner and which were undertaken in this case comport with the policy supporting inventory searches as described in *Opperman* and do not offend the limits of reason or common sense. *Cf. United States v. Best*, 135 F.3d 1223,1225 (8th Cir. 1998) (inventory search which included disassembling the door panels of the vehicle was not reasonable in scope).

later statements to law enforcement are not "fruit of the poisonous tree."

### B.    Missouri v. Seibert/Oregon v. Elstad

Another issue must be addressed, however, before the admissibility of the post-*Miranda*, pre-March 18 statements can be assumed. It is undisputed that Sullivan made non-*Mirandized*, custodial statements regarding the possession of marijuana during the traffic stop on March 13. The law enforcement personnel did not question Sullivan at all about the counterfeit money before they administered the *Miranda* warnings, but the interrogation about the money occurred only minutes after the incriminating, non-*Mirandized* marijuana admission. The admissibility of the warned statements must, therefore, be evaluated pursuant to *Missouri v. Seibert*, 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004). The fourth paragraph of *Seibert* explains the question presented by that case: "the interrogating officer follows [an unwarned incriminating statement] with *Miranda* warnings and then leads the suspect to cover **the same ground a second time. The question here is the admissibility of the repeated statement.**" *Seibert*, 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004) (emphasis added).    Because law enforcement did not interrogate Sullivan[18] about the counterfeit money before they advised him of his *Miranda* rights, *Seibert* is not controlling. *See, e.g. United States v. Walker*, 518 F.3d 983, 985 (8th Cir. 2008) (*Seibert* not controlling because defendant's warned and unwarned statements were given at different times, in different locations, and "were unrelated to a significant degree" because first statement was about marijuana and second statement was about a firearm).

"The prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda v. Arizona*, 384 U.S. 436, 444,

---

[18]The brief conversation about the money which did occur before the *Miranda* warning was initiated by Sullivan, not the officers, and pertained to the amount of the money contained in the envelope, not its legitimacy. (Sullivan asked how much money was in the envelope and explained that he did not know how much was in the envelope because he found it at the gas station).

86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966). It has already been determined that the marijuana admission must be suppressed.

> Because *Miranda* warnings may inhibit persons from giving information, this Court has determined that they need be administered only after the person is taken into custody or his freedom has otherwise been significantly restrained. Unfortunately, the task of defining custody is a slippery one, and policemen investigating serious crimes cannot realistically be expected to make no errors whatsoever. If errors are made by law enforcement officers in administering the prophylactic *Miranda* procedures, they should not breed the same irremediable consequences as police infringement of the Fifth Amendment itself. It is an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period. Though *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made.

*Oregon v. Elstad,* 470 U.S. 298, 309, 105 S.Ct. 1285, 1293, 84 L.Ed.2d 222 (1985) (internal punctuation and citations omitted). "A subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded the admission of the earlier statement." *Id.*, 470 U.S. at 313, 105 S.Ct. at 1296. Mr. Sullivan has offered no evidence that his unwarned admission that he possessed a small amount of marijuana was obtained through actual coercion. No evidence of strong-arm tactics, deception, or other coercive strategies was presented. The Eighth Circuit has declined on at least one occasion to apply the *Oregon v. Elstad* doctrine to *Mirandized* statements given "on the heels" of non-*Mirandized* statements. *See United States v. Carter,* 884 F.2d 368, 373 (8th Cir. 1989). It has applied the doctrine, however, in other cases where the first non-*Mirandized* statements were made in the absence of coercion or improper police tactics. *See, United States v. Robinson,* 20 F.3d 320, 322 (8th Cir. 1994); *United States v. Williams,* 136 F.3d 547, 552 (8th Cir. 1998). The facts of this case are much more similar to *Robinson* and *Williams* than to *Carter.* Specifically, in *Carter,* the unwarned statement was given, and consent to search was obtained, through coercive and deceptive police tactics. "Our review of the surrounding circumstances and the entire course of police conduct with respect to the suspect convinces us that the second confession cannot be allowed into evidence." *Carter,* 884 F.2d at 373. In *Robinson* and *Williams,* on the other hand, the Court found no coercion or improper tactics (other than the failure to administer the warning) prior to the unwarned statements. Likewise, the only error Sullivan has shown here is Deputy Waldner's failure to give

-19-

the warning prior to asking whether Sullivan had any marijuana in his van before beginning an inventory search which would have inevitably revealed the presence of the marijuana anyway. Such failure, while not commendable, is not the sort of coercive or diabolical tactic which renders a subsequent voluntary, warned statement about a completely different crime inadmissible.

Because the post-*Miranda*, pre-March 18 statements are not fruit of the poisonous tree, are not controlled by *Seibert*, and are admissible under *Elstad*, they should not be suppressed.

### C. The March 18 Statements

Finally, Sullivan asserts his March 18 statements should be suppressed on the independent ground that they were given after he asserted, but was refused, his right to counsel in violation of his Fifth and Sixth Amendment rights.

There is no dispute that on March 18, 2009, Sullivan remained in the Beadle County Jail and was therefore in custody and had the right to counsel under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) (Fifth Amendment right to counsel arises at custodial interrogation). The Sixth Amendment right to counsel arises "at or after the time that judicial proceedings have been initiated . . .whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Brewer v. Williams*, 430 U.S. 387, 398, 97 S.Ct. 1232, 1239, 51 L.Ed.2d 424 (1977).[19] The complaint was filed in state court on March 16. The complaint

_____

[19]Sullivan claims the interrogation on March 18 violated both his Fifth and Sixth Amendment rights. It is noted that a very recent United States Supreme Court case alters the landscape of the Sixth Amendment right to counsel by overruling *Michigan v. Jackson*, 475 U.S. 625 (1986), which forbade police from initiating interrogation once a defendant has requested counsel at an arraignment or similar proceeding. *See Montejo v. Louisiana*, 556 U.S. ___ (Decided May 29, 2009). *Montejo* made clear, however, that it left undisturbed other prophylactic measures toward the same end: "Under *Miranda's* prophylactic protection of the right against compelled incrimination, any suspect subject to custodial interrogation has the right to have a lawyer present if he so requests, and to be advised of that right. Under *Edwards'* prophylactic protection of the *Miranda* right, once such a defendant 'has invoked his right to have counsel present' interrogation must stop. And under *Minnick's* prophylactic protection of the *Edwards* right, no subsequent interrogation may take place until counsel is present 'whether or not the accused has consulted with his attorney.'" *Montejo*, 556 U.S. at ___. (Slip Op. at 15). Whether Sullivan's Sixth Amendment rights had attached, however, is really a non-issue because if he was in custody and had previously invoked his right to counsel "the validity of any subsequent waiver of *either* the fifth or sixth amendment right to counsel is judged by essentially the same standard." *Pittman v. Black*, 764 F.2d 545, 547 (8th Cir. 1985), *citing, Fields v.*

-20-

was filed in federal court on March 17, and the Indictment was filed on March 18. Sullivan was arrested and arraigned on the federal charges on March 20. Although he was in custody beginning on March 13 and charges were pending as early as March 16, therefore, Sullivan's first court appearance was on March 20.[20]

If an accused expresses his desire to deal with law enforcement only through counsel, he cannot be subjected to further interrogation until a lawyer has been made available unless the suspect himself initiates further communication with law enforcement. *Edwards v. Arizona*, 451 U.S. 477, 484-85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). "Invocation of the Miranda right to counsel requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of any attorney." *Davis v. United States*, 512 U.S. 452, 459, 114 S.Ct. 2350, 2355, 129 L.Ed.2d 362 (1994)(citation omitted).

> A suspect must unambiguously request counsel and if he does not articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney . . . *Edwards* does not require that the officers stop questioning the suspect.
>
> \*\*\*
>
> Supreme Court precedent does not require the cessation of questioning if a suspect makes a reference to any attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel.

*Dormire v. Wilkinson* 249 F.3d 804 (8th Cir. 2001) (citations omitted). Also, if the reference to an attorney is ambiguous, it is *good* but not *required* practice for the police to ask questions to clarify whether the suspect does want an attorney present. Id. at fn. 2.

If, however, a suspect unambiguously requests counsel at any time before or during an interview, he is not subject to further questioning until counsel has been made available to him unless he initiates the conversation. *Edwards v. Arizona*, 451 U.S. 477, 484-85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). "This rigid prophylactic rule is designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights." *United States v. Smith*, 2008 WL

---

*Wyrick,* 706 F.2d 879, 881 (8th Cir. 1983).

[20]There is no explanation on the record why Mr. Sullivan sat in jail for an entire week being interviewed by state and federal agents, with felony charges filed against him in both state and federal court, but without an initial appearance/arraignment in either place.

650450 (internal punctuation altered) (*citing, Michigan v. Harvey*, 494 U.S. 344, 350 (1990). "Thus, a suspect who has invoked his right to counsel cannot be questioned regarding any offense unless any attorney is actually present." *Id.* When a suspect has requested counsel during a custodial interview a valid waiver of that right " cannot be established by showing only that he responded to further police-initiated interrogation even if he has been advised of his rights." *Edwards v. Arizona*, 451 U.S. 477, 484-85, 101 S.Ct. 1880, 1884, 68 L.Ed.2d 378 (1981).

In *Dormire* the suspect said "could I call my lawyer?" That statement was held to be not an unambiguous request for counsel and the statements were not suppressed. In *Smith*, the suspect said "can I get a lawyer here?" That statement was held to be an unambiguous request for counsel and the statements were suppressed.

In this case, Agent Walker testified "Gary said he still wants to talk to us but he wants to have his attorney present." TR at 71. Agent Bobzien testified "he stated that he wanted to speak to us but he wanted his attorney present." TR at 81. I find these statements by Sullivan unambiguously requested the assistance of counsel during a custodial interrogation on March 18, 2009. He was, therefore, "not subject to further interrogation by the authorities until counsel had been made available to him, unless [he initiated] further communication, exchanges or conversations with the police." *Edwards*, 451 U.S. at 485-86, 101 S.Ct. at 1885.

Sullivan did not initiate the conversation which followed his request for counsel. Instead, the following conversation occurred:

- Bobzien said "who's your attorney?" to which Sullivan bluffed and said "Carmen Means."
- Bobzien said "let's call her then";
- Sullivan again bluffed and said "she's on her way";
- Bobzien said "how did she know the meeting time? How could she be your attorney since you have not had your initial appearance yet?" (Incorrectly implying Sullivan, even though he **had been in custody for five days**, was not entitled to an attorney until his initial appearance);
- Sullivan admitted Carmen had not been retained yet, but his boss was working on getting Carmen retained;
- Bobzien said "how much is her retainer fee?";
- Sullivan admitted he did not know how much Carmen's retainer fee was ;
- Bobzien asked if Sullivan had talked to Carmen Means yet;
- Sullivan admitted he hadn't talked to Carmen yet;
- Bobzien asked if Sullivan's boss had told Sullivan he'd hired Carmen;
- Sullivan admitted he had not;

- Bobzien asked Sullivan to admit he did not know whether Carmen was going to represent him or not;
- Sullivan admitted he did not know if Carmen was going to represent him or not;
- Walker said "do you want to have an attorney or do you want to talk to us?" (Incorrectly implying these two alternatives were mutually exclusive);
- Walker reminded Sullivan that was up to Sullivan, but "reiterated" that Walker had already connected Sullivan through his fingerprints to criminal activity in Fargo, North Dakota . Walker showed Sullivan the federal charging document which had been filed in Sioux Falls and reminded Sullivan that cooperation would be brought to the attention of the federal prosecutor;
- Sullivan said "let's chop it up."
- Walker read Sullivan the *Miranda* rights and the interrogation proceeded without counsel present.

The agents initiated the above conversation after Sullivan unambiguously requested counsel. Although the agents did not beat Mr. Sullivan or overtly threaten him, their words were subtly coercive, and constituted the "badgering" which the rules of *Miranda, Edwards and Minnick* were designed to prevent. A person untrained in the law could have been led to believe from the above-cited conversation that (1) he was not entitled to an attorney until his first court appearance; and/or (2) he was not entitled to an attorney before his first court appearance unless he could afford the retainer fee; and/or (3) he had to choose between having an attorney present or talking with the agents. For these reasons, Sullivan's March 18 statements should be suppressed.

## CONCLUSION

For the reasons more fully explained above, it is respectfully recommended to the District Court that Defendant's Motion to Suppress (Doc. 21) be **GRANTED** in part and **DENIED** in part as follows: (1)Defendant's statement regarding possession of marijuana should be suppressed; (2) all physical evidence found as a result of the search of the van Defendant was driving when he was arrested on March 13, 2009 should be admissible; (3) Defendant's *Mirandized*, in-custody statements to law enforcement officials should be admissible, except the March 18 interview. Sullivan's statements from the March 18 interview should be suppressed.

## NOTICE TO PARTIES

The parties have ten (10) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained. Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the District

Court.

Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990)

Nash v. Black, 781 F.2d 665 (8th Cir. 1986)

Dated this _9th_ day of June, 2009.

BY THE COURT:

_____
John E. Simko
United States Magistrate Judge

ATTEST:

JOSEPH HAAS, Clerk

By _Colleen Schulte_, Deputy

(SEAL)

-24-